**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BAYFRONT MEDICAL CENTER, INC.<br>701 Sixth Street, South<br>St. Petersburg, FL 33701,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL O. LEAVITT, Secretary,<br>United States Department of Health and Human<br>Services,<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR SUMS DUE AND FOR DECLARATORY**
**AND INJUNCTIVE RELIEF UNDER THE MEDICARE ACT**

## I. INTRODUCTION

1.    This is an action for judicial review of a final decision of the Secretary of the

Department of Health and Human Services ("Secretary") denying Medicare payments to the

plaintiff Hospital for costs incurred from June 1, 1998 through December 31, 1999 in connection

with the Hospital's approved residency training programs.  The Medicare payments at issue are

payments for direct graduate medical education ("GME") costs and indirect medical education

("IME") costs.  In administrative proceedings before the agency, the Secretary denied GME and

IME payments with respect to most of the Hospital's discharges of Medicare beneficiaries who

were enrolled in certain Medicare managed care plans ("HMOs").  The Secretary's decision is

contrary to law and should be reversed.

2.      In 1997, Congress amended the Medicare statute to provide for IME and GME

payments with respect to hospital discharges of Medicare beneficiaries enrolled in a Medicare

HMO. Pub. L. No. 105-33, §§ 4622 and 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11) and

1395ww(h)(3)(D)(i)). The 1997 legislation also required the Secretary to collect from the

contracted Medicare HMO plans the data needed to make these payments to teaching hospitals.

Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)). In contravention of

those statutes, the Secretary denied the IME and GME payments at issue because he determined

that the Hospital did not submit unnecessarily duplicative claims for payment to the Secretary's

"fiscal intermediary."

3.      In fact, though, the Hospital timely submitted claims for payment on the

Secretary's prescribed claim forms to the Medicare HMO plans that enrolled the patients.

Moreover, the HMOs submitted that same information on the same forms with respect to the

same patients to the fiscal intermediary, before the intermediary rendered its final payment

determination for the periods at issue. Furthermore, data on the Hospital's Medicare HMO

discharges was made available to the fiscal intermediary prior to the fiscal intermediary's audit

of each year's cost report. The Secretary nevertheless determined, incorrectly, that the Hospital

should not receive IME and GME payments with respect to discharges of Medicare HMO

patients where it did not submit the duplicate claims to the fiscal intermediary within a specific

time period required under regulations that are expressly inapplicable when services are

furnished, as in this case, on a prepaid capitation basis by a Medicare HMO. 42 C.F.R. § 424.30.

4.      The Secretary's decision is not only contrary to the controlling statutes and

regulations he relied upon, but it is also invalid, and should be set aside, because it violates the

public protection provision of the Paperwork Reduction Act. 44 U.S.C. § 3512(a). The

2

Secretary did not obtain the required approval for the requirement, applied in this case, that hospitals submit duplicate claims for payment not only to the Medicare HMOs that make payments to hospitals for services furnished to plan enrollees, but also to the Medicare fiscal intermediaries. The public protection provision of the Paperwork Reduction Act, therefore, prohibits the Secretary from imposing any penalty upon, or withholding a benefit from, the Hospital due to its alleged failure to meet the Secretary's illegal requirement.

5.      Additionally, the Secretary's application of his triplicate billing requirement is arbitrary and capricious, and should be set aside, because the Secretary and his agents unreasonably refused to use data on the Hospital's Medicare HMO discharges that was available and auditable in determining the Hospital's IME and GME payments with respect to Medicare HMO patients.

6.      For all the foregoing reasons, the Secretary's final decision should be reversed. The Plaintiff requests that the Court direct the Secretary to make the IME and GME payments the Hospital seeks with respect to discharges of Medicare HMO patients.

## II. JURISDICTION AND VENUE

7.      This action arises under the Medicare Act, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq.

8.      Jurisdiction is proper under 42 U.S.C. § 1395oo(f).

9.      Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

## III. PARTIES

10.      The plaintiff is Bayfront Medical Center, Inc., a not-for-profit corporation that owns and operates an acute care hospital in St. Petersburg, Florida. Bayfront Medical Center (the "Hospital") participates in the Medicare program as a "provider of services" under Medicare provider number 10-0032.

3

11.    The Defendant is Michael O. Leavitt in his official capacity as Secretary of the United States Department of Health and Human Services ("HHS"), the federal agency that administers the Medicare program.  References to the Secretary herein are meant to refer to him, his subordinates, and to his official predecessors or successors as the context requires.

12.    The Centers for Medicare and Medicaid Services ("CMS") is a component of HHS with responsibility for day-to-day operation and administration of the Medicare program. Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA"). References to CMS herein are meant to refer to the agency and its predecessors.

## IV.  MEDICARE PAYMENT DETERMINATIONS AND APPEALS

A.    <u>Claims for Payment for Services Furnished to Medicare Beneficiaries</u>

13.    This case concerns the Medicare Act, 42 U.S.C. §§ 1395 <u>et</u>. <u>seq</u>., which provides payment for "inpatient hospital services" furnished by participating "providers of services," like the Hospital in this case.  42 U.S.C. § 1395d(a)(1).

14.    Medicare payments to hospitals are usually determined by fiscal intermediaries (generally private insurance companies) that contract with CMS under 42 U.S.C. § 1395h.

15.    The Medicare fiscal intermediaries make payments to hospitals for inpatient services furnished to patients who are entitled to benefits under Medicare Part A and who are not enrolled in a Medicare HMO.  Initial payments for inpatient hospital services are made by the intermediaries upon receipt of patient-specific claims submitted by hospitals on a CMS claim form, called the UB-92 form, within the time periods and subject to the requirements and procedures prescribed in Medicare regulations codified at 42 C.F.R. § 424.30 <u>et seq</u>.

16.    When a Medicare Part A beneficiary enrolls in a Medicare HMO, the Secretary pays the HMO on a prepaid capitation basis (an amount per enrollee) for items and services that are furnished to the Medicare HMO enrollee and are covered under Medicare Part A.  <u>See</u> 42

4

U.S.C. §§ 1395w-21(a)(1) and (i)(1), 1395mm(a)(1) and (a)(3); 42 C.F.R. §§ 417.524, 417.584 and 422.250 (1999).

17.    When a hospital provides services to a Medicare HMO enrollee, the hospital bills and receives payment from the HMO.

18.    The procedures, requirements, and time periods for submission of Medicare claims to the intermediaries do not apply "when services are furnished on a prepaid capitation basis by [Medicare HMOs]." 42 C.F.R. § 424.30.

B.    Final Intermediary Payment Determinations

19.    The initial payments made by a Medicare intermediary to a hospital (for services furnished to Medicare Part A beneficiaries who are not enrolled in a Medicare HMO) are subject to a final aggregate payment determination made annually by the intermediary, based upon its review of an annual cost report prepared by the hospital.

20.    After the close of a hospital's fiscal year, the hospital must submit a cost report showing both the cost incurred by it during the fiscal year and the appropriate portion of those costs to be allocated to Medicare. 42 C.F.R. §§ 413.24 and 413.50. The Medicare fiscal intermediary analyzes the cost report prepared by the hospital and issues a Notice of Program Reimbursement, or "NPR," that informs the hospital of the intermediary's final determination of the hospital's Medicare reimbursement for the period covered by the cost report. See 42 C.F.R. § 405.1803. See also In Re: Medicare Reimbursement Litigation, Baystate Health System v. Thompson, 309 F. Supp.2d 89, 92 (D.D.C. 2004) ("Baystate").

C.    Review of Intermediary Payment Determinations

21.    A hospital is entitled to an appeal to the Provider Reimbursement Review Board ("PRRB" or "Board") if it is dissatisfied with an intermediary's determination in an NPR as to the amount of Medicare payment due the hospital for a cost reporting period. 42 U.S.C.

§ 1395oo(a); 42 C.F.R. § 405.1835.  The PRRB is an administrative tribunal appointed by the

Secretary.  42 U.S.C. § 1395oo(h).

22.    The final decision of the PRRB is subject to review by the Administrator of CMS

pursuant to a delegation of authority by the Secretary to the Administrator.  See 42 U.S.C.

§ 1395oo(f); 42 C.F.R. § 405.1875.

23.    The Secretary's final decision, as set forth either in a final decision of the Board

or in a final decision of the Administrator of CMS, may be reviewed in a civil action before this

Court.  42 U.S.C. § 1395oo(f).

24.    This Court reviews the Secretary's final decision under the applicable provisions

of the Administrative Procedure Act ("APA").  42 U.S.C. § 1395oo(f).  The applicable

provisions of the APA require the Court to set aside the Secretary's final decision if it is in

excess of the Secretary's statutory authority, arbitrary and capricious, an abuse of discretion,

unsupported by substantial evidence, or otherwise not in accordance with law.  5 U.S.C. § 706.

## V.  NATURE OF THE CASE

25.    The periods at issue are the Hospital's cost reporting periods ending June 30,

1998, June 30, 1999, and December 31, 1999.

26.    During the cost reporting periods at issue, the Hospital operated medical

residency training programs approved by national accrediting organizations.  At all relevant

times, the Hospital incurred and received Medicare reimbursement for two types of costs in

connection with its medical residency training programs.  These costs are referred to as direct

graduate medical education ("GME") costs and indirect medical education ("IME") costs.

27.    In appeals to the PRRB, the Hospital challenged the fiscal intermediary's

disallowance of GME and IME payments with respect to most of the Hospital's discharges of

Medicare beneficiaries who were enrolled in (i) a health maintenance organization or

competitive medical plan with a Medicare risk sharing contract under section 1395mm of the Medicare Act or (ii) a M+C plan under Part C of the Medicare Act. For ease of reference, all of these organizations are collectively referred to herein as "Medicare HMOs."

28. After a hearing, the Board issued a decision dated October 12, 2007. The PRRB reversed the intermediary's disallowance of IME and GME payments with respect to Hospital discharges of Medicare HMO enrollees.

29. Upon review of the Board's decision, the Deputy Administrator of CMS reversed the Board's decision overturning the disallowance of payments with respect to Medicare HMO enrollees.

30. The Deputy Administrator's decision constitutes the Secretary's final determination on the issue in dispute for the cost reporting periods at issue.

31. The Deputy Administrator's decision was sent to the Hospital's counsel under cover of a letter dated December 12, 2007. The Hospital's counsel received that letter and the accompanying decision of the Deputy Administrator on December 17, 2007.

## VI. GENERAL RULES GOVERNING PAYMENTS FOR GME AND IME COSTS

A. <u>GME Payment Calculation</u>

32. Medicare pays most hospitals, including the plaintiff Hospital, under a prospective payment system for the operating costs of inpatient hospital services furnished to Medicare Part A beneficiaries who are not enrolled in a Medicare HMO. 42 U.S.C. § 1395ww; 42 C.F.R. Part 412. <u>See also</u> <u>Baystate</u>, 309 F. Supp.2d at 92.

33. Under the prospective payment system for operating costs, Medicare pays predetermined, standardized amounts per discharge, subject to certain hospital-specific payment adjustments to the standardized payment rates. <u>See</u> 42 U.S.C. § 1395ww; 42 C.F.R. Part 412.

34.    The prospective payment system for the operating costs of inpatient hospital services does not apply to the direct costs of approved residency training programs, which are referred to as GME costs. See 42 U.S.C. § 1395ww(a)(4); 42 C.F.R. §§ 412.1(a)(1) and (f)(7). A separate payment for a teaching hospital's GME costs is determined annually by the Medicare intermediary through the year-end cost report process.

35.    A hospital's GME payment for each fiscal year is the product of the hospital's average per resident amount, derived and updated from a 1984 base period, times the hospital's number of interns and residents in approved programs during the fiscal year in question, times the hospital's Medicare patient load. 42 U.S.C. § 1395ww(h)(3). In general, the Medicare patient load is a percentage of the hospital's total patient days attributable to Medicare patients for the fiscal year in question. 42 U.S.C. § 1395ww(h)(3)(C).

36.    For periods before 1998, the GME payment calculation did not provide for payment with respect to patient days associated with Medicare beneficiaries who were enrolled in Medicare HMOs because these days were not counted as Medicare patient days in the GME payment calculation described above. See 42 C.F.R. §§ 413.86(b) and (d)(3)(1999); see also 54 Fed. Reg. 40286, 40294-95 (Sept. 29, 1989).

37.    Beginning on January 1, 1998, and throughout the cost reporting periods at issue, the GME payment calculation provides for additional GME payment to a teaching hospital with respect to patient days associated with Medicare beneficiaries who are enrolled in Medicare HMOs. See 42 U.S.C. § 1395ww(h)(3)(D)(i); 42 C.F.R. § 413.86(d)(1999).

38.    Congress directed that the additional GME payments made with respect to hospitals' Medicare HMO patient days were to be phased in gradually over a five-year period in which like amounts were to be removed from the capitation rates paid by the Secretary to the

Medicare HMOs. See 42 U.S.C. §§ 1395ww(d)(11)(C), 1395ww(h)(3)(D)(ii); and 1395w-23(a)(3)(B)-(C); see also 42 C.F.R. §§ 422.254(c) and (e)(2) (1999).

B.    IME Payment Calculation

39.    Under the Medicare prospective payment system for operating costs of inpatient hospital services, the standard payment rates per discharge are subject to certain hospital-specific adjustments. One of the adjustments to the standard payment rates is for the indirect costs of teaching hospitals associated with medical residency training programs, which are referred to as IME costs. See 42 U.S.C. § 1395ww(d)(5)(B); 42 C.F.R. § 412.105.

40.    The IME payment add-on to the standard prospective payment system rates is intended to compensate teaching hospitals for higher-than-average operating costs per discharge that are statistically correlated with the hospital's intensity of teaching. See Riverside Methodist Hospital v. Thompson, 2003 U.S. Dist. LEXIS 15163 (S.D. Ohio 2003).

41.    A teaching hospital's IME payment adjustment for a fiscal year is determined by the Medicare intermediary through the year-end cost report process.

42.    The IME payment calculation is based, in part, on the ratio of a hospital's number of full-time equivalent residents who were training in approved training programs during a hospital cost reporting period to the hospital's number of beds in the cost reporting period. See 42 U.S.C. § 1395ww(d)(5)(B)(ii); 42 C.F.R. § 412.105(a)(1).

43.    Until January 1, 1998, the only other variable term in the IME payment calculation consisted of the aggregate amount of the standard payments made to a hospital under the prospective payment system for operating costs of inpatient hospital services furnished to Medicare Part A beneficiaries who were not enrolled in a Medicare HMO during the hospital's cost reporting period. See 42 U.S.C. §§ 1395ww(d)(5)(B)(i) and (d)(11); 42 C.F.R. §§ 412.105(a)(2) and (g).

9

44.    Beginning on January 1, 1998, and throughout the cost reporting periods at issue, the IME payment calculation also considers estimated average payments per discharge that would have been paid under the prospective payment system for hospital discharges of Medicare beneficiaries who were enrolled in a Medicare HMO when they received services from the hospital. 42 U.S.C. § 1395ww(d)(11); 42 C.F.R. §§ 412.105(g).

45.    The additional IME payments provided with respect to teaching hospitals' discharges of Medicare HMO enrollees were to be phased in gradually over a five-year period in which like amounts were to be removed from the capitation rates paid by the Secretary to the Medicare HMOs. See 42 U.S.C. §§ 1395ww(d)(11)(C), 1395ww(h)(3)(D)(ii); and 1395w-23(a)(3)(B)-(C); see also 42 C.F.R. § 422.254(c) and (e)(2) (1999).

## VII. STATUTES, REGULATIONS AND AGENCY GUIDANCE CONCERNING IME AND GME PAYMENTS WITH RESPECT TO MEDICARE HMO ENROLLEES

A.    1997 Legislation

46.    In the Balanced Budget Act of 1997, Congress amended the Medicare statute, as described above, to provide for the additional IME and GME payments, phased in over a five-year period beginning on January 1, 1998, with respect to hospital inpatients who are enrolled in Medicare HMOs. Pub. L. No. 105-33, §§ 4622 and 4624 (codified at 42 U.S.C. §§ 1395ww(d)(11) and 1395ww(h)(3)(D)(i) and (ii)).

47.    In the same 1997 legislation, Congress directed the Secretary to require the Medicare HMO contractors to submit data, and any other information the Secretary deemed necessary, regarding inpatient hospital services furnished to Medicare HMO enrollees. Pub. L. No. 105-33, § 4001 (codified at 42 U.S.C. § 1395w-23(a)(3)(B)).

B.    August 1997 Rule

48.    In the preamble to a final rule published in the Federal Register on August 29,

1997, the Secretary acknowledged that Congress had amended the Medicare Act to provide for

IME and GME payments with respect to Medicare HMO enrollees, that Congress required the

Secretary to collect necessary data from the contracted HMOs to implement adjustments to the

capitation rates paid to them, and that the agency was "considering the data requirements

necessary to implement both the direct and indirect medical education and [Medicare HMO] risk

adjustment provisions." 62 Fed. Reg. 45965, 46007

C.    May 1998 Rule

49.    In the preamble to a final rule published in the Federal Register on May 12, 1998,

the Secretary stated: "We anticipate teaching hospitals will need to submit claims associated

with Medicare+Choice discharges to the fiscal intermediaries for purposes of receiving indirect

and direct medical education payments." 63 Fed. Reg. 26318, 26342. The Secretary did not

adopt such a requirement in that rule.

D.    June 1998 Rule

50.    On June 26, 1998, CMS published notice of an interim final rule in the Federal

Register, and adopted a regulation, requiring Medicare HMOs to submit hospital encounter data

to the Medicare fiscal intermediaries for each HMO's own enrollees. 63 Fed. Reg. 34968, 35092

(June 26, 1998). The regulation, codified at 42 C.F.R. § 422.257(a), stated:

> Each M+C organization must submit to CMS (in accordance with CMS
> instructions) all data necessary to characterize the context and purposes of each
> encounter between a Medicare enrollee and a provider, supplier, physician, or
> other practitioner.

51.    The June 1998 rule further provides that the HMOs' submission of this data to the Medicare fiscal intermediaries must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate." 42 C.F.R. § 422.257(d)(1998).

52.    The Secretary further clarified in the preambles to the 1998 interim final rule and a later rule that the HMOs were required to submit hospital encounter data to the fiscal intermediaries on the same form (UB-92) and in a format that is "identical" to the form and format of hospital claims for payment to the intermediaries, because "pricing of discharges" of Medicare HMO enrollees would be required to recalibrate the capitation payments made by CMS to the HMOs. 63 Fed. Reg. at 35006; 65 Fed. Reg. 40170, 40249 (June 29, 2000).

E.    July 1998 Program Memorandum to Intermediaries (A-98-21)

53.    In July 1998, CMS issued a program memorandum regarding the provision for additional GME and IME payments with respect to discharges of hospital patients enrolled in Medicare HMOs. Program Memorandum (Intermediaries), HCFA Pub. 60-A, Trans. No. A-98-21 (July 1, 1998), Provider Exhibit P-24.[1]

54.    The July 1998 program memorandum was addressed to the Medicare fiscal intermediaries. The memorandum principally addressed "intermediary and standard system changes needed" to provide IME and GME payments with respect to Medicare HMO enrollees. Id.

55.    The program memorandum instructed the fiscal intermediaries to notify providers that: "Teaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME." Id.

---

[1] References herein to Provider Exhibits or the Stipulation of Facts are meant to refer to documents in the record below before the PRRB.

56.    The July 1998 program memorandum did not instruct the intermediaries to give hospitals notice that they must submit claims to the intermediary in order to receive IME or GME payments with respect to hospital discharges of Medicare HMO enrollees.

57.    The July 1998 program memorandum also did not instruct the intermediaries to give hospitals notice as to any required time period for submission of claims to the intermediaries in order to receive IME or GME payments with respect to hospital discharges of Medicare HMO enrollees.

58.    The July 1998 program memorandum was not published in the Federal Register.

F.    Intermediary's Hospital Medicare Bulletin H-90

59.    Following the issuance of CMS' July 1998 memorandum, discussed above, the Hospital's fiscal intermediary issued a newsletter, entitled "Hospital Medicare Bulletin H-90," the stated purpose of which was "to outline *intermediary* and standard system changes needed to process requests for IME and DGME supplemental payments" for Medicare HMO enrollees. Hospital Medicare Bulletin H-90, Provider Exhibit P-31 (emphasis added).  It then goes on to address IME payments with respect to Medicare HMO enrollees. .

60.    In the second paragraph, the Bulletin provides that PPS hospitals must submit a claim to their regular intermediary with a certain code for IME.   At the conclusion of the discussion of IME on the first page, the Bulletin stated that **"[b]eginning with discharges on or after July 1, 1998, providers <u>may not</u> submit HMO paid claims (no pay bills)"** to their intermediary. <u>Id</u>. (underline added; bold in the original).

61.    In apparent contradiction with this sentence, in a subsequent paragraph of the newsletter's discussion of IME payments, it said:  "Teaching hospitals may submit bills for inpatient stays by managed care enrollees for payment of IME." <u>Id</u>.

62.    The newsletter also did not address any required time period for submission of claims to the intermediaries.

63.    The newsletter reasonably could be read to mean that encounter data (or bills) concerning hospital discharges of Medicare HMO enrollees may not be submitted by hospitals to the fiscal intermediaries but hospitals can submit their bills to the Medicare HMOs and receive IME payments as a result.

G.    June 2000 Rule

64.    In the preamble to a final rule published in the Federal Register on June 29, 2000, the Secretary responded to comments regarding the June 1998 interim final rule, discussed above, and the submission of encounter data regarding hospital discharges of Medicare HMO enrollees. 65 Fed. Reg. 40170, 40249.

65.    In his response to those comments, the Secretary acknowledged a "range of problems in the submission of encounter data," including intermediary processing problems and confusion regarding hospital submission of encounter data. 65 Fed. Reg. at 40249.

66.    In order to address some of those problems, the June 2000 rule established a retrospective reconciliation process for encounter data that was submitted late by the Medicare HMOs to the fiscal intermediaries. See 65 Fed. Reg. at 40250; see also 42 C.F.R. § 422.257(g)(2)(2000).

67.    This reconciliation process was established to allow the HMOs the benefit of appropriately recalibrated capitation payment rates that take into account all the relevant available encounter data concerning hospital discharges of Medicare HMO enrollees, including data that was untimely submitted by the HMOs to the fiscal intermediaries. See 65 Fed. Reg. at 40250.

H.    February 2003 Program Memorandum (A-003-007)

68.    In February 2003, CMS issued a program memorandum concerning GME payments with respect to Medicare HMO enrollees who are treated by certain hospitals that are exempt from the prospective payment system.  Program Memorandum, Trans. No. A-03-007 (Feb. 3, 2003), Provider Exhibit P-37.

69.    The February 2003 memorandum acknowledged that CMS' prior guidance had failed to address how the agency would make GME payments with respect to Medicare HMO patients of hospitals that are exempt from the prospective payment system.

70.    The February 2003 memorandum stated that these hospitals "must submit claims to their regular intermediary in UB-92 format" to obtain GME payments with respect to Medicare HMO patients, but this requirement was made effective only prospectively beginning July 1, 2003.  Id.

71.    The February 2003 memorandum also stated that GME payments to these hospitals with respect to Medicare HMO patients in prior periods would be addressed by the agency "in a separate issuance," which, on information and belief, was never published anywhere if it was ever issued at all.  See id.

## VIII.  FACTS SPECIFIC TO THE PLAINTIFF HOSPITAL'S CASE

72.    For Medicare patients not enrolled in Medicare HMOs, the Hospital submitted claims for payment to the fiscal intermediary in a UB-92 format.  These claims included each Medicare beneficiary's Medicare Health Insurance Claim Number ("HIC#") from his or her Medicare identification card and the treating physician's Medicare Unique Physician Identification Number ("UPIN").

73.    For Medicare HMOs, the Hospital submitted claims for payment to the Medicare HMOs in a UB-92 format.  As required, these claims included each Medicare beneficiary's

Social Security number from his or her Medicare HMO identification card and the treating physician's Florida license number.  Provider Exhibit P-40.  The Medicare HMO identification cards do not contain HIC#s.

74.     In response to the fiscal intermediary's Hospital Medicare Bulletin H-90, the Hospital developed a system to create and electronically submit bills in a UB-92 format to the fiscal intermediary for patients of Medicare HMOs in order to receive IME and GME reimbursement.  The Hospital encountered significant problems.

75.     Due to technical problems with the newly created system, UB-92s were not submitted to the fiscal intermediary for a significant number of days of care rendered to Medicare HMO patients.  UB-92s for the identical services were, however, submitted by the Hospital to the Medicare HMOs.  The Medicare HMOs then submitted these claims to the fiscal intermediary as required by law.

76.     The Hospital was further hindered in submitting separate bills to the fiscal intermediary for IME and GME payments for Medicare HMO patients because the Hospital did not have all of the data necessary to complete a UB-92 for submission to the fiscal intermediary. Specifically, the Hospital did not have the patient's HIC# or the physician's UPIN.

77.     The fiscal intermediary required a UB-92 to include a beneficiary's HIC# and a physician's UPIN.  Since Medicare HMOs do not use the HIC# and the Medicare HMO patient insurance card does not have the patient's HIC# on it; the Hospital was unable to gather that necessary information.  Even if the Hospital could have acquired this information, since the Hospital's admitting system cannot accept two identification numbers for a patient it would only have been able to collect the Social Security number for Medicare HMO beneficiaries.

78.    The Hospital attempted to solve this problem by designing its billing system to try

and "guess" the HIC# for Medicare HMO beneficiaries based upon the patient's Social Security

number.  Many of these "guesses" were not correct and the days were not reflected on the

intermediary's Provider Statistical and Reimbursement Report ("PS&R") for each cost reporting

period.

79.    The Hospital also did not have the UPIN, which was required by the fiscal

intermediary.  The UB-92s submitted by the Hospital to Medicare HMOs had to contain the

physician's state license number and not the UPIN number.  Thus, creating a separate UB-92 for

the fiscal intermediary required more data gathering, since the UPIN number was not saved in

the system.

80.    The Intermediary's PS&R for each fiscal year in question did not include all of

the statistics for the Hospital's discharges in those years for beneficiaries who were enrolled in

Medicare HMOs.  Stipulation of Facts ¶ 6; Provider Exhibits P-8, P-9 and P-10.

81.    Although the statistics were not in the PS&R, the fiscal intermediary had

auditable documentation to support the number of days claimed by the Hospital.  The Hospital

maintained logs of this encounter data, which were made available to the fiscal intermediary

prior to the fiscal intermediary's audit of each year's cost report.  Stipulation of Facts ¶¶ 7-10.

Although the fiscal intermediary audited this data for the fiscal year ending June 30, 1998,

during all subsequent audits, the fiscal intermediary did not accept additional data from the

Hospital's records and did not consider the Hospital's logs.  The fiscal intermediary adjusted to

the PS&R.  Id.

82.    In addition to the encounter data supplied to the Intermediary by the Hospital, the

Medicare HMOs furnished the fiscal intermediary with the same encounter data in identical

UB-92 format prior to the issuance of the NPRs for the fiscal years at issue. The fiscal intermediary did not use any of this information in adjusting the Hospital's cost reports; the fiscal intermediary adjusted directly to the PS&R. Stipulation of Facts ¶¶ 7-10.

83.    For the Hospital's fiscal year ending June 30, 1998, the Hospital's records reflected that it had 6,836 days of inpatient care for Medicare HMO beneficiaries and that the Hospital electronically submitted claims to the fiscal intermediary in a UB-92 format for 2,303 of these days. Provider Exhibits P-11 and P-14. The PS&R relied upon by the fiscal intermediary only reflected 508 days of care rendered to Medicare HMO patients. Stipulation of Facts ¶ 7.

84.    During the audit, the fiscal intermediary only accepted the 508 days that were listed on the PS&R and an additional 3,873 days that were included on the Hospital's log for purposes of GME reimbursement. Stipulation of Facts ¶ 8; Provider Exhibits P-5 and P-15. Although this adjustment included days of care included in the Hospital's records that were not in the PS&R, the fiscal intermediary did not allow 1,459 days of care rendered to Medicare HMO beneficiaries that were reflected in the Hospital's logs. Id. The fiscal intermediary gave no indication as to why some days documented in Hospital's records were included and others were not. For IME, the fiscal intermediary adjusted directly to the PS&R and did not consider the Hospital's records. Id.

85.    For the Hospital's fiscal year ending June 30, 1999, the Hospital's records reflected that it had 15,715 days of inpatient care for Medicare HMO beneficiaries and that it electronically submitted claims to the fiscal intermediary in a UB-92 format for 6,413 of these days. Provider Exhibits P-12 and P-17. The PS&R relied upon by the fiscal intermediary only reflected 2,417 days of care rendered to Medicare HMO patients. Stipulation of Facts ¶ 9.

During the audit the fiscal intermediary adjusted directly to the PS&R for both GME and IME. <u>Id</u>.

86.    For the Hospital's fiscal year ending December 31, 1999, the Hospital's records reflected that it had 5,492 days of inpatient care for Medicare HMO beneficiaries and that it electronically submitted claims to the fiscal intermediary in a UB-92 format for 2,677 of these days.  Provider Exhibits P-13 and P-19.  The PS&R relied upon by the fiscal intermediary only reflected 2,225 days of care rendered to Medicare HMO patients.  Stipulation of Facts ¶ 10. During the audit the fiscal intermediary adjusted directly to the PS&R for both GME and IME. <u>Id</u>.

87.    The fiscal intermediary ultimately refused to accept or include the Hospital's encounter data concerning the discharges of Medicare HMO enrollees in its final IME and GME payment determinations for any of the 1998-199 cost reporting periods at issue, except for GME payments in the Hospital's fiscal year ending June 30, 1998.  Stipulation of Facts ¶¶ 7-10.

### IX. ASSIGNMENT OF ERRORS

88.    The Secretary's final decision below should be set aside because it is contrary to law, arbitrary and capricious, and not based upon substantial evidence in the record. <u>See</u> 42 U.S.C. § 1395oo(f); 5 U.S.C. § 706.

89.    The Secretary's denial of IME and GME payments with respect to Hospital discharges of Medicare HMO enrollees should be set aside for the following reasons:

A.    The Secretary's denial is inconsistent with the 1997 legislation providing for such payments to be made to teaching hospitals like the plaintiff Hospital and requiring the Secretary to collect from the Medicare HMOs the encounter data needed to properly make those payments to teaching hospitals.  Pub. L. No. 105-33, §§ 4001, 4622 and 4624 (codified at 42 U.S.C. §§ 1395w-23(a)(3)(B), 1395ww(d)(11) and 1395ww(h)(3)(D)(i)(II)).

B.     The Secretary's denial also is inconsistent with the plain language and intent of

the regulations establishing procedures and time periods for submission of claims for payment to

the Medicare Part A intermediaries in all cases except when services are furnished on a prepaid

capitation basis by a Medicare HMO.  42 C.F.R. § 424.30.

C.     The Secretary's denial also is invalid because the agency did not invoke the notice

and comment rulemaking procedures mandated by the APA in adopting the duplicative billing

requirement that was applied in the final decision in this case.

D.     The Secretary's denial and the program instructions he relied upon also violate the

public protection provision of the Paperwork Reduction Act, 44 U.S.C. § 3512(a), and are

otherwise arbitrary and capricious, because the Secretary did not obtain the required approval for

a new requirement that teaching hospitals must submit unnecessarily duplicative payment claims

both to Medicare HMOs and to Medicare fiscal intermediaries in order to receive the IME and

GME payments due under the Medicare Act.

E.     In addition, the Secretary's denial is otherwise arbitrary, capricious and otherwise

contrary to law because the agency unreasonably refused to use data on the Hospital's Medicare

HMO discharges that was available and auditable and imposed an unnecessary, duplicative

billing requirement on the Hospital in order to receive the IME and GME payments due under

the Medicare Act.

## X.  REQUEST FOR RELIEF

90.     WHEREFORE, the plaintiff Hospital requests an Order:

A.     declaring invalid the Secretary's final decision denying the Hospital IME and

GME payments with respect to discharges of Medicare HMO enrollees;

B.    reversing the Secretary's final decision and requiring the Secretary promptly to pay the Hospitals all sums due as a result of the reversal of that decision, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

C.    requiring the Secretary to pay legal fees and costs of suit incurred by the Hospital; and

D.    providing such other relief as the Court may consider appropriate.

Respectfully submitted,

Christopher L. Crosswhite
D.C. Bar No. 450927
DUANE MORRIS LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
(202) 776-7846 (phone)
(202) 776-7801 (fax)

Joanne B. Erde, P.A.
DUANE MORRIS LLP
200 S. Biscayne Boulevard
Suite 3400
Miami, FL 33131
(305) 960-2218

Dated: Feb 13, 2008

Attorneys for Plaintiff

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Bayfront Medical Center, Inc. | Michael O. Leavitt, Secretary, U.S. Department of Health and Human Services |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     Pinellas
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

DUANE MORRIS LLP
505 9th Street, N.W., Suite 1000
Washington, DC 20004-2166
(202) 776-7800

ATTORNEYS (IF KNOWN)

---

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity
(Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☒ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. *Habeas Corpus/ 2255*** | ○ **H. *Employment Discrimination*** | ○ **I. *FOIA/PRIVACY ACT*** | ○ **J. *Student Loan*** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. *Labor/ERISA (non-employment)*** | ○ **L. *Other Civil Rights (non-employment)*** | ○ **M. *Contract*** | ○ **N. *Three-Judge Court*** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

42U.S.C. sec. 1395oo(f); action for judicial review under the Medicare Act.

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    Check YES only if demanded in complaint

JURY DEMAND:    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  February 13, 2008    SIGNATURE OF ATTORNEY OF RECORD  *Christopher L Crosswhite*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.